THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGE MACKLIN, Defendant-Appellant.

Fifth District   No. 75-116

Opinion filed April 1, 1976.

Stephen P. Hurley and Michael J. Rosborough, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Robert L. Craig, Assistant State's Attorney, of counsel), for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This is an appeal by the defendant, George Macklin, from judgments of conviction entered by the circuit court of St. Clair County on jury verdicts of guilty to the charges of murder and armed robbery and the respective sentences of 50 to 100 years and 4 to 6 years, to be served concurrently, imposed thereunder.

Before the defendant's trial, defendant's privately retained counsel

filed a motion to suppress identification. A hearing on this motion was conducted and the motion was denied. No contentions are raised by the defendant on appeal with respect to the denial of this motion. On appeal defendant contends that he was not proven guilty beyond a reasonable doubt because the testimony of two identification witnesses was contradictory.

The first witness to testify at defendant's trial was Leo Guccione. He stated that he was the owner of Guccione's Supermarket located in St. Clair County. He further stated that at approximately 5:30 on the 12th day of March, "a group of robbers came in masked, and one of them scaled the entrance to my office where we cash checks and have a safe * * *." This individual "brandished * * * a silvery pistol" towards the witness and exclaimed that this was a holdup. After the witness personally gave this individual the money he had demanded, the witness was ordered to lie on the floor. The witness identified the defendant as this individual. The witness also testified that later during the course of the robbery this individual returned to the office and "led" the witness to one of the cash registers. The witness then complied with a demand to open the cash register. While at this register the witness saw "four robbers all together." The witness testified that all of the robbers were armed with guns of one type or another. During the course of the robbery the witness heard "quite a few shots." After the robbery the witness found Charles Doty, a security guard, lying on the floor between two check-out counters. The witness stated that he was positive that the defendant was one of the robbers. He stated that at one point during the course of the robbery he was only 11 or 12 inches from the defendant. He also stated that he viewed the defendant "from two to three minutes" during the robbery.

On cross-examination the witness testified that the defendant had "clipped me with the butt of his pistol." While the witness admitted that he had been hurt by the blow, he claimed that he had retained his "mental acuity at all times." The witness also admitted that he had told the police that the robber who had accosted him had gray hair and was in his late thirties. The witness testified that he had not seen anyone shoot Doty. The witness also testified that he had identified the defendant in a lineup.

On redirect examination, the witness explained that the reason he had initially described the defendant as "gray-headed" was that the "panty hose" that the defendant had placed over his head was "silvery." On re-cross examination, the witness stated all of the "stocking" was "silvery." The witness testified that despite the stocking he "could see and observe his features." He stated that "the closeness of him gave me the opportunity to identify him later."

The next witness called by the State was Nathanial McCoy, a former employee of Guccione. McCoy was located at the rear of the supermarket

when the robbers entered the store. While he observed one of the robbers scale the office wall he could not identify this robber as the defendant. On cross-examination the witness testified that he had initially described this individual as "one Negro male, medium complexion, gray-headed, possibly in his middle forties." The witness explained that "after they told me that they had on masks", the "only thing really that I [he] knew was that he [this robber] was short." The witness denied that anyone requested that he change his initial description. The witness testified that the defendant appeared taller than he pictured the robber to be. The witness noted that he had observed the robber from the "back room" and that the robber was "bending over" to go in the office.

The State's next witness was Curtis Hill, an employee of Guccione. He testified that he was working on the day of the robbery in question. He testified that Charles Doty had been shot during the robbery. The witness testified that the defendant was the robber who had accosted him. The witness testified that he had identified the defendant during a lineup that had been conducted earlier.

On cross-examination Hill testified that he had caught "a glimpse" of the man who had escorted Guccione to one of the cash registers. He stated that this was *not* the same robber who had accosted him. He reiterated that the robber who had accosted him was the defendant. The witness did not remember what type of mask the defendant was wearing on the day of the robbery.

The State also called Herman Wenos, a pawnbroker. He testified that he had sold one Smith & Wesson .357 magnum hand gun, Serial Number N108054, to Charles Doty on March 11, 1974. He identified People's Exhibit No. 15 as the gun he had sold Charles Doty. No objection was raised to this testimony.

The State next called Richard Stone, a detective with the East St. Louis Police Department. The witness testified that he went to the home of Mr. Sheret, the defendant's stepfather, to locate the defendant. The witness stated that he found the defendant in the basement "hiding behind an old refrigerator." The defendant was placed under arrest.

On cross-examination the witness was asked if the arrest of the defendant occurred after the police had arrested Ronnie Macklin. The State's Attorney objected to this question as being beyond the scope of direct examination. The objection was overruled. The witness answered that Ronnie Macklin had been arrested the night before the defendant had been arrested. No guns, large sums of money, nor masks were recovered at the time of the defendant's arrest.

The following witness was Robert White, a sergeant with the East St. Louis Police Department. Over objection of defense counsel, he related the events surrounding the arrest of Aaron Donnald and a description of

the weapons recovered at such time. One weapon recovered was People's Exhibit No. 15. Other weapons recovered included a derringer, a sawed-off shotgun, and a five-shot "chief special." A .410-gauge shotgun was later recovered from the residence of Darnell Carpenter.

The State next called Dr. Roman Patrick, a pathologist, to the stand. He testified that Charles Doty died as a result of "abdominal hemorrhage and abdominal injuries caused by bullets in that region."

Raymond Herr, an investigator with the State's Attorney's office, next testified on behalf of the State. He testified as to the manner in which the pretrial lineups had been conducted.

The State's final witness was James Walker, a detective with the East St. Louis Police Department. Without objection, he testified to the apprehension of Darnell Carpenter and Ronnie Macklin. He testified that both subjects were apprehended running away from Guccione's Supermarket after the robbery. A .38 Smith & Wesson was removed from Ronnie Macklin's hip pocket at the time of his arrest. At the police station a Harris & Richardson revolver was taken from Ronnie Macklin. Carpenter, who had been conveyed to the police station by other officers, had two revolvers taken from him at the police station. The defendant's, George Macklin's, driver's license was found on Carpenter, together with a stocking mask.

On cross-examination the witness stated that the defendant's driver's license was found in Carpenter's upper right pocket.

In a conference held outside the hearing of the jury the State offered into evidence each of the weapons the police had recovered. No objection was interposed to any of these exhibits by defense counsel. An instructional conference was then held.

The defense rested without proffering any evidence.

The defendant phrases the first issue for review in the following manner, "Whether the defendant was proven guilty beyond a reasonable doubt where the testimony of two identification witnesses, purporting to identify the defendant as one of the masked participants was blatantly contradictory?" Stated more objectively, the first issue is whether the testimony of the State's two eyewitnesses who positively identified the defendant becomes incredible, *i.e.*, inherently improbable, where each witness placed the defendant in a different relative position during the commission of the crime. The defendant contends, among other things, that each witness identified a different participant of the crime as the defendant and, therefore, the convictions must be reversed.

■■ In support of this contention, the defendant cites *People v. Coulson*, 13 Ill. 2d 290, 298, 149 N.E.2d 96, 99, wherein our supreme court reversed the convictions of two defendants because the State's evidence was "improbable, unconvincing and completely unsatisfactory." The sa-

lient point of that decision was the fact that the evidence proffered by the State was not credible since it was "contrary to the laws of nature, or universal human experience  *  *  *." (13 Ill. 2d 290, 297, 149 N.E.2d 96, 99.) Under such circumstances the court concluded that despite the general rule that a reviewing court will not substitute its judgment for that of the trier of fact, a reviewing court is not bound to believe the witness(es) of the prevailing party. Directing its attention to criminal appeals the court stated "*  *  * it is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed. [Citations.]" (13 Ill. 2d 290, 296, 149 N.E.2d 96, 99.) Consequently, where testimony is contrary to the laws of nature, or universal experience, a court of review is not bound to believe the witness. (*People v. Kilgore*, 59 Ill. 2d 173, 319 N.E.2d 489; *People v. Dawson*, 22 Ill. 2d 260, 174 N.E.2d 817; *People v. Coulson*.) Such is not the present case. It is our opinion that the defendant was clearly shown to have taken part in the crimes of which he stands convicted.

Either the testimony of Guccione or Hill was sufficiently credible that the jury could have believed either one. The testimony of either witness placed the defendant at the scene of the crime and ascribes to the defendant the role of one of the participants. We do not consider the fact that each witness placed the defendant in conflicting positions throughout the robbery to be fatal to the State's case. Unlike *People v. Kilgore*, 59 Ill. 2d 173, 319 N.E.2d 489, cited by the defendant, the testimony here present, albeit conflicting, is not exculpatory.

■■ It is not contrary to universal experience for the victims of a crime to be mistaken about some of the circumstances surrounding their observation and, yet, be able to positively identify the offender. The facts presented in the instant case establish that the victims viewed the defendant under circumstances conducive to positive identification. The proximity of the defendant to the victims, the lighting conditions, and the duration of each view render the discrepancy with the eyewitnesses' initial description to the police, which was explained, insufficient to raise a reasonable doubt as to the guilt of the accused. (See *People v. Rodgers*, 53 Ill. 2d 207, 290 N.E.2d 251.) Also noteworthy is the fact that the defendant's driver's license was found in the pocket of one of the individuals apprehended while fleeing the scene of the robbery.

The second issue raised by the defendant is whether the testimony of police officers concerning the arrest of the co-indictees and the weapons seized incidental to such arrests were erroneously admitted into evidence. As noted in the factual review set forth earlier in this opinion the only objection raised by the defendant concerned the admission of testimony concerning the arrest of Aaron Donnald and the weapons seized incident-

al to his arrest. In fact, it was the defendant's own counsel who first asked, over the objection of the State's Attorney, about the arrest of one of the other co-indictees, Ronnie Macklin. No objection was raised to the testimony concerning the arrest of either Ronnie Macklin or Darnell Carpenter, or the weapons seized at the time of their arrest. The defense counsel offered no objection to the State's motion to introduce all of the weapons seized, including those seized from Donnald, into evidence, despite the fact that there was ample opportunity to object outside the presence of the jury. During the closing arguments the defendant's counsel attempted to utilize his failure, or waiver, of objection to the admission into evidence of these exhibits to convince the jury of the defendant's innocence. Therein he stated,

> "We didn't object to the admission of any of these exhibits. That hasn't been brought to your attention as it should, but I will say it now. We didn't object to any of them. One through twenty-three. All the guns. What accounts for that?"

Finally, no objection was raised to the admission of any of this evidence in the defendant's written post-trial motion for a new trial. The defendant argues that even if we consider these objections waived we should consider the admission of such evidence to be "plain error" within purview and meaning of Supreme Court Rule 615 (Ill. Rev. Stat. 1973, ch. 110A, par. 615). We disagree.

From this record it is obvious that the strategy of defense counsel was to have all the weapons admitted into evidence, although some of them were not properly admissible, so that defense counsel could argue to the jury that there was no connection between defendant and all the exhibits; that the State was unable to prove a connection with defendant and hope that by lack of such connection the jury would consider that a reasonable doubt had been raised. That the strategy, obviously adopted in desperation, backfired, does not lead to the conclusion that defendant was deprived of a fair trial.

■■■ To invoke the "plain error" rule the defendant must establish that the error(s) complained of were so prejudicial as to clearly deny the defendant his right to a fair trial. (*People v. Mays*, 48 Ill. 2d 164, 269 N.E.2d 281; *People v. Smith*, 21 Ill. App. 3d 366, 316 N.E.2d 170; *People v. Hanson*, 10 Ill. App. 3d 593; 295 N.E.2d 120.) When the errors here complained of are considered in conjunction with the entire record presented to us on appeal, we cannot say that such errors either individually, or collectively, were of such magnitude so as to deprive the defendant of a fair trial. We, therefore, hold that these alleged errors, some of which were never raised in the trial court and all of which were omitted from the defendant's written post-trial motion for a new trial, were waived and cannot be raised for the first time on appeal.

The defendant's final contention is that the sentence imposed for murder, 50 to 100 years, was excessive. After reviewing the entire record we can find no merit in this contention.

■■ Since the sentence imposed is within the statutory limits our review is limited to whether the trial judge abused his discretion in sentencing the defendant. (*People v. Taylor*, 33 Ill. 2d 417, 211 N.E.2d 673; *People v. Van Gilder*, 26 Ill. App. 3d 152, 324 N.E.2d 715.) While the record shows that the defendant did not have a particularly reprehensible record, it also shows that the murder in question was committed during an armed robbery in which the defendant played an active role. And, while it is unclear which participant actually shot the deceased, the evidence produced at the defendant's trial established that the defendant had demonstrated little aversion to the use of force. In fact, his personal action of striking Guccione with the butt of his pistol caused a cut requiring six or seven stitches in Guccione's chin. Furthermore, contrary to the defendant's contention, the record does not show that consideration of the defendant's rehabilitative potential was completely neglected before the sentence of 50 to 100 years was imposed. Under these circumstances we find no abuse of discretion in the sentence for murder which was imposed by the trial court.

Accordingly, the judgments of conviction entered against the defendant by the circuit court of St. Clair County on the charges of murder and armed robbery and the respective sentences imposed thereunder are affirmed.

Affirmed.

G. J. MORAN and JONES, JJ., concur.